# IN THE SUPREME COURT OF IOWA

No. 17–1555

Filed May 18, 2018

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**SANDRA ESTHER SUAREZ-QUILTY,**

Respondent.

_____

On appeal from the report of the Iowa Supreme Court Grievance Commission.

An attorney appeals a report of the grievance commission recommending we revoke her license to practice law in this state. **LICENSE REVOKED.**

Elizabeth E. Quinlan, Des Moines, for complainant.

David L. Brown of Hanson, McClintock & Riley, Des Moines, for respondent.

**ZAGER, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board (Board) brought a complaint against an attorney that alleged multiple violations of the Iowa Rules of Professional Conduct, including the misappropriation of funds in her representation of two clients. The Iowa Supreme Court Grievance Commission (commission) found numerous violations of our ethical rules and recommended a revocation of her license to practice law in this state. After our de novo review of the record, we agree with the recommendation of the commission and revoke the attorney's license to practice law in the State of Iowa.

## I. Background Facts and Proceedings.

Attorney Sandra Suarez-Quilty has been licensed to practice law in the State of Iowa since 2000. During the period of the conduct giving rise to this disciplinary action, Suarez-Quilty was a solo practitioner in Des Moines, Iowa, where she provided legal services primarily in the areas of immigration law, family law, and criminal law. Suarez-Quilty stipulated to all facts contained in the Board's final complaint, which are described as follows.

**A. McElroy Matter.** Suarez-Quilty represented Darlena McElroy in a guardianship case involving McElroy's elderly father, Percy McElroy (Percy). After McElroy was enjoined from acting on Percy's behalf, Suarez-Quilty and McElroy met with Percy on January 29, 2013, without the knowledge or consent of his attorney, Jessica Chandler, or his guardian ad litem, Sarah Dewein. While she was meeting with Percy, Suarez-Quilty left Chandler a voicemail proclaiming, "I am sitting with your client . . . and we have some things we would like to discuss with you." Chandler returned the call immediately to ask why Suarez-Quilty

was meeting with Percy, to which Suarez-Quilty responded, "I represent him now."

In a second phone call that day, Suarez-Quilty informed Chandler that McElroy was going to remove Percy from his location. Dewein and a social worker immediately responded to Percy's location to find Suarez-Quilty there with Percy. When Dewein confronted Suarez-Quilty with a copy of the injunction enjoining McElroy from acting as Percy's guardian, Suarez-Quilty continued to insist that McElroy would act as Percy's guardian. Despite these facts, at a hearing in this case conducted on February 8, Suarez-Quilty told the judge, "I did not visit with Mr. McElroy [on January 29] with regard to anything as it relates to this specific matter."

**B. Unauthorized Practice of Law.** Suarez-Quilty was convicted of operating while under the influence of alcohol (OWI), second offense on February 11, 2013. Her license to practice law in Iowa was subsequently suspended due to disability from February 15 until June 4. On April 18, during her suspension, Suarez-Quilty contacted attorney Christine Branstad in the course of representing a client in a child visitation matter. Through the exchange of numerous emails, Suarez-Quilty negotiated visitation for her client. About a week later, Suarez-Quilty emailed Branstad again on behalf of her client stating, "Until official reinstatement (any day), service will be accepted by [another attorney]." It was at this point that Branstad learned that Suarez-Quilty's license was suspended. When Branstad informed Suarez-Quilty that she was acting improperly, Suarez-Quilty disagreed and told Branstad that she was "in compliance and acting in conformity therewith . . . . feel free to ask . . . about anything you wish prior to making such hefty allegations as it has been a hard enough road."

**C. Trust Account Issues.** Following an audit that was initiated on March 27, 2013, the auditor's report showed Suarez-Quilty had the following deficiencies: "Failure to properly deposit client receipts into the trust account" on several occasions; "[f]ailure to maintain a receipt and disbursements journal;" "[f]ailure to maintain ledger records;" "[f]ailure to maintain accountings to clients;" "[f]ailure to maintain copies of bills;" "[f]ailure to maintain a checkbook register;" "[f]ailure to maintain records of all electronic transfers from client trust accounts;" "[f]ailure to prepare written monthly reconciliations of the client trust account bank statements to the check register, monthly reconciliations of check register to client account totals, and a monthly trial balance of open client account balances;" "[f]ailure to deposit advance fee and expense payments;" and "[f]ailure to provide notification upon withdrawal of fee or expense." Another audit report dated July 3, 2014, revealed many of the same deficiencies with the exception of failure to maintain accounting to clients, failure to maintain copies of client billing statements, and failure to provide clients with timely notifications upon her withdrawal of fees or expenses. Suarez-Quilty also failed to provide the auditor with all records requested between December 2013 and April 2014.

**D. Ferazz Matter.** Stephen Ferazz retained Suarez-Quilty to represent him in a custody modification matter on May 8, 2014. He gave Suarez-Quilty a $1500 retainer, but they did not enter into a written fee agreement. On May 30, Suarez-Quilty withdrew this $1500 from her trust account, yet did not provide Ferazz with a contemporaneous billing statement. She did not communicate with Ferazz between June 18 and July 22.

It is unclear when the opposing party sent Suarez-Quilty the draft of a modification agreement, but the opposing party contacted Suarez-

Quilty on July 7 asking for clarification. On July 22, Suarez-Quilty emailed Ferazz informing him that she spent fifteen hours on his case and she needed him to pay the balance. Ferazz requested an itemization of his $1500 fee payment. On July 24, in the presence of another attorney, Ferazz telephonically severed his attorney–client relationship with Suarez-Quilty. Suarez-Quilty subsequently emailed him that day, saying, "[W]ish you the best of luck moving forward. I will plan on writing off the rest of your balance given your dissatisfaction."

However, on July 25, Suarez-Quilty again emailed Ferazz to inform him that she did not know whether the other party agreed to anything in his case. Then, on July 26, Suarez-Quilty sent Ferazz an invoice for $800 which showed that she had only earned $1360 in fees at the time she withdrew Ferazz's entire $1500 retainer. Despite Ferazz's decision to sever the attorney–client relationship with Suarez-Quilty, Suarez-Quilty continued negotiation attempts on his behalf through July 28.

**E. Felony OWIs.** On April 8, 2015, Suarez-Quilty was involved in a traffic stop in which she displayed signs of impairment. She was arrested for OWI, third offense. She was arrested again on May 15 and charged with OWI, third offense, as well as violating the open container law. As a result of these arrests, on July 30, Suarez-Quilty was formally charged with two counts of OWI, third offense, a class "D" felony. Suarez-Quilty pled guilty to both felony OWI, third offense charges. She was sentenced to five years in prison, and she was ordered to pay fines, surcharges, and court costs.

**F. Rawson Matter.** Jonathon Rawson hired Suarez-Quilty to represent him in a paternity/custody action on September 25, 2014. Rawson's friend, Jordyn Eckert, actively supported his efforts to seek custody of his child and assisted him with paying for his legal services.

Suarez-Quilty did not have an attorney–client relationship with Eckert, nor did they have a signed fee agreement. On January 30, 2015, Eckert authorized Suarez-Quilty to charge her Visa credit card for legal services Suarez-Quilty was providing Rawson. Eckert had sole control of this credit card. On May 22, the district court entered an order providing the biological mother and Rawson with joint legal custody of their minor child, with primary physical care of the child awarded to the mother. Visitation was provided for Rawson. During the course of her representation of Rawson, Rawson and/or Eckert paid $19,500 in attorney fees. On May 26, Suarez-Quilty sent Rawson a final bill with a balance of $13,100.13.

Throughout June, Suarez-Quilty and Rawson corresponded by email about the bills. On July 5, Rawson emailed Suarez-Quilty again with a description of alleged discrepancies in the billing statements. The email contained a spreadsheet with comments regarding what Rawson believed were duplicate charges and charges for services Suarez-Quilty had not provided. Rawson requested a copy of his monthly billing statements. Additionally, he stated, "Please cease all further communication with me in regards to collections of this account. I will opt for arbitration of the billing for this account if you continue to harass me either by email, text, or phone call." Suarez-Quilty replied on July 6 telling Rawson, "Good luck with that, so now the word thief is added to the litany of adjectives." She sent him another email on July 9 asking Rawson where he would like to "be served." On July 10, Suarez-Quilty charged $5000 to Eckert's Visa card without Eckert's authorization. Eckert contacted the credit card company to dispute this charge, and the company reimbursed her for the $5000 following a fraud investigation.

**G. Keny Matter.** Philip Keny retained Suarez-Quilty in February of 2016 to file a notice of appeal with the United States Citizenship and

Immigration Services (USCIS). Keny paid Suarez-Quilty a flat fee of $2500, and the two did not enter into a written fee agreement. Suarez-Quilty did not deposit the $2500 flat fee into a trust account, instead placing it directly in her law firm operating account. On February 23, Suarez-Quilty advanced a check for $630 to the USCIS for the cost of the filing fee in Keny's appeal and mailed the check and notice of appeal to the USCIS. She notified Keny that she filed his appeal, and Keny later paid Suarez-Quilty the $630 she had advanced for filing his appeal. Suarez-Quilty deposited the $630 into her law firm operating account.

The USCIS returned the notice of appeal and $630 check to Suarez-Quilty on March 9. On March 15, Suarez-Quilty responded to an inquiry from Keny about his appeal to inform him that she had not heard from USCIS. She texted him the next day to let him know she received "electronic notice today" that USCIS denied his appeal.

Suarez-Quilty failed to refund Keny his $630, and she did not have a colorable future claim to the $630. Rather, she converted these funds for her own use. Keny hired attorney Michael Keller to represent him in a small claims action against Suarez-Quilty. Keny filed a petition claiming Suarez-Quilty requested an additional $1000 from Keny in "bad faith," just prior to the deadline to file his appeal. The petition further claimed that "on information and belief, no appeal was in fact filed."

Keller struggled to serve Suarez-Quilty due to her lack of cooperation, but a process server was eventually able to serve Suarez-Quilty at her residence on June 15. Keller emailed Suarez-Quilty while the small claims action was pending to request Keny's records showing that she filed his appeal. Keller also requested an accounting of legal fees. Suarez-Quilty failed to provide Keller with either of the requested records. She had not answered the small claims petition by July 6, and the court

set a hearing for the matter for July 20. After Suarez-Quilty failed to appear for the hearing, the magistrate judge entered default judgment against her.

Suarez-Quilty moved to set aside this judgment on August 17, alleging she never received notice of the small claims action or the July 20 hearing. Suarez-Quilty insisted she had only learned about the lawsuit upon receiving the default judgment in the mail around August 1. However, the magistrate judge denied Suarez-Quilty's motion to set aside the judgment when Suarez-Quilty did not appear at the September 7 hearing on the motion.

Following Suarez-Quilty's motion to set aside judgment, Keny supplemented his complaint to add an additional claim that Suarez-Quilty made false statements to the court in her motion. Specifically, he asserted Suarez-Quilty had falsely claimed that she was not served and did not know of the small claims action against her until August 2016. The process server's affidavit supported this allegation against Suarez-Quilty, as it demonstrated that she was served on June 15. Moreover, Suarez-Quilty acknowledged the action in a July 6 email accusing Keller of harassing her because he "sued" her. The magistrate judge notified the Board that Suarez-Quilty had made false statements to the court.

**H. Proceedings.** The Board filed its original complaint against Suarez-Quilty on September 22, 2014. This complaint charged Suarez-Quilty with three counts. Count I alleged she violated two ethical rules by engaging in communication with a represented party and making false statements to the tribunal in the McElroy Matter. Count II alleged Suarez-Quilty violated two ethical rules by engaging in the unauthorized practice of law in a family law matter. Count III alleged she violated fourteen ethical rules due to her handling of fees and trust account issues. As will be

discussed later, the Board subsequently filed its first amended complaint on January 21, 2015, adding a fourth count. This count was later dismissed by the Board.

On August 28, the commission cancelled Suarez-Quilty's grievance commission hearing and set a status hearing in response to her motion requesting a continuance so that she could seek alcohol and mental health treatment. On October 14, Suarez-Quilty pled guilty to the two counts of third offense OWI, class "D" felonies, and was sentenced to prison. She was later transferred from prison to the inpatient Continuum Program at Broadlawns Hospital.

While Suarez-Quilty was completing her sentence, four status hearings were held with her attorney via telephone. Following the final status hearing on November 15, 2016, the Board amended its complaint again to dismiss the fourth count from its previous amended complaint and add four new counts. Count V[1] alleged Suarez-Quilty violated seven ethical rules due to her neglect and trust account issues in her representation of Ferazz. Count VI alleged Suarez-Quilty violated an ethical rule by committing two felony third-offense OWIs. Count VII alleged Suarez-Quilty violated two ethical rules based on her unauthorized use of a credit card in the Rawson matter. Count VIII alleged Suarez-Quilty violated eight ethical rules in her representation of Keny including neglect, accounting issues, failure to provide requested file records, knowingly making a false statement to the court, and conduct prejudicial to the administration of justice.

---

[1]Count IV was dismissed, but the complaint refers to what is technically the fourth count as the fifth count.

Suarez-Quilty filed an answer to the fourth[2] amended complaint on January 5, 2017, and a hearing date was set for July 10. On June 21, the Board filed its fifth amended complaint. Suarez-Quilty stipulated to each fact and rule violation alleged in the fifth amended complaint. In total, the fifth and final complaint against Suarez-Quilty contained seven counts that alleged over thirty violations of the ethical rules.

The hearing that was scheduled to take place on July 10 did not take place. All issues were resolved when the parties entered into the June 23 stipulation where Suarez-Quilty stipulated to all of the facts, findings, and aggravating and mitigating circumstances involved in this case. On September 26, the commission filed its findings of facts, conclusions of law, and recommendation of sanction.

The commission found Suarez-Quilty committed the following violations of the Iowa Rules of Professional Conduct: 32:1.3 (lack of diligence); 32:1.15(c) (failing to deposit client funds into a trust account); 32:1.15(d) (refunding of advance fees or payments); 32:1.15(f) (failure to maintain client trust accounts under the Iowa Court Rules); 32:1.16(a) (failure to decline representation); 32:1.16(c) (failure to terminate representation); 32:3.3(a)(1) (candor toward the tribunal); 32:4.2(a) (dealing with person represented by counsel); 32:5.5(a) (unauthorized practice of law); 32:8.4(b) (committing a criminal act reflecting adversely upon the lawyer's ability to practice law—third-offense OWIs); 32:8.4(b) (committing a criminal act reflecting adversely upon the lawyer's ability to practice law—unauthorized use of credit card); and 32:8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The commission found Suarez-Quilty violated some of these rules multiple

---

[2]The Board only filed four complaints total, but the complaints are misnumbered due to a scrivener's error.

times. The commission also found her in violation of the following client trust account rules: 45.1 (failure to deposit client funds in an identifiable trust account in Iowa); 45.2(2) (failure to deliver client property); 45.2(3)(*a*)(1) (failure to maintain a record of deposits to and withdrawals from client trust accounts); 45.2(3)(*a*)(2) (failure to maintain client trust account records); 45.2(3)(*a*)(4) (failure to maintain copies of accountings); 45.2(3)(*a*)(5) (failure to maintain copies of client legal fees and expenses); 45.2(3)(*a*)(7) (failure to maintain physical or electronic equivalents of checkbook information and bank statements); 45.2(3)(*a*)(8) (failure to maintain records of electronic transfers from client trust accounts); 45.2(3)(*a*)(9) (failure to maintain copies of monthly trial balances and reconciliations); 45.7(3) (failure to deposit and maintain appropriate fee and expense payments); and 45.7(4) (failure to notify the client of advance fee or expense payments). The commission also found Suarez-Quilty violated some of these rules on multiple occasions. Finally, the commission found Suarez-Quilty violated Iowa Court Rule 34.17(4) (unauthorized practice of law).

The commission recommended revocation of Suarez-Quilty's license to practice law in the State of Iowa. This was based on her rule violations showing theft by unauthorized use of a credit card and conversion in the Rawson and Keny matters. Upon our review, Suarez-Quilty requests a ninety-day suspension. The Board continues to recommend revocation.

## II. Standard of Review.

"We review attorney disciplinary cases de novo*." Iowa Supreme Ct. Att'y Disciplinary Bd. v. Guthrie*, 901 N.W.2d 493, 497 (Iowa 2017). The Board has the burden to prove disciplinary violations by a convincing preponderance of the evidence which requires more proof than a preponderance of the evidence, yet does not rise to the level of proof beyond

a reasonable doubt. *Id.* "We give the commission's findings and recommendations respectful consideration, but we are not bound by them," as we have the discretion to impose sanctions that differ from those recommended by the commission. *Id.* Finally, we are not bound by an attorney's stipulation to a disciplinary violation, though the parties are bound by the stipulations of facts in a disciplinary proceeding. *Id.* Ultimately, "[e]ven if an attorney's stipulation concedes a rule violation, we will only find that a violation occurred if the facts are sufficient to support the stipulated violation." *Id.* (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Willey*, 889 N.W.2d 647, 653 (Iowa 2017)).

**III. Analysis.**

**A. Rule Violations.** While the commission found Suarez-Quilty violated numerous ethical rules with regard to her representation of multiple clients, the crux of this appeal focuses on the commission's finding that Suarez-Quilty misappropriated client funds in violation of rule 32:8.4(c) in the Rawson and Keny matters. It was ultimately this finding that led the commission to recommend revocation of her license to practice law in Iowa, and this is the finding we will address first since it is the most severe. Though Suarez-Quilty stipulated to the rule violations and actions in question on appeal, the Board still must prove attorney misconduct before our court since "[a]n attorney's stipulation as to a violation is not binding on us." *Id.* (alteration in original) (quoting *Willey*, 889 N.W.2d at 653). Thus, we must examine the violations alleging Suarez-Quilty misappropriated client funds to determine whether the facts support her stipulated violations. *See id.*

Rule 32:8.4(c) provides, "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). "An attorney violates

this rule when he or she commits theft by misappropriating client funds."
*Guthrie*, 901 N.W.2d at 498. The criminal act of theft of misappropriation
occurs when a person

> [m]isappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property or conceals found property, or appropriates such property to the person's own use, when the owner of such property is known to the person.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 844 N.W.2d 111, 116
(Iowa 2014) (quoting Iowa Code § 714.1(2) (2011)). We use the same
definition of misappropriation as the criminal act, but "we do not require
a criminal conviction for theft in order to find a violation of our rules."
*Guthrie*, 901 N.W.2d at 498. "This is due in part to the fact that we only
require allegations of theft in the context of attorney disciplinary cases to
be proved by a convincing preponderance of the evidence." *Id.* "[A]
criminal law defense is not a defense in a disciplinary proceeding since the
purpose of a disciplinary hearing is not primarily intended to punish the
lawyer but rather to protect the public." *Iowa Supreme Ct. Att'y
Disciplinary Bd. v. Green*, 888 N.W.2d 398, 404 (Iowa 2016) (alteration in
original) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Khowassah*,
837 N.W.2d 649, 655 (Iowa 2013)).

To find a violation of rule 32:8.4(c), we also must find "a level of
scienter that is more than negligent behavior or incompetence." *Iowa
Supreme Ct. Att'y Disciplinary Bd. v. Barry*, 908 N.W.2d 217, 226 (Iowa
2018). "Scienter requires that the attorney acted knowingly, intentionally,
or with the aim to mislead." *Guthrie*, 901 N.W.2d at 498. The ultimate
question "is whether the effect of the lawyer's conduct is to mislead rather

than to inform." *Barry*, 908 N.W.2d at 226 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 211–12 (Iowa 2016)).

In the Rawson matter, the commission relied on Suarez-Quilty's stipulation to violating Iowa Code sections 715A.6(1)(*a*)(3) and 715A.6(2)(*b*) in support of its finding that she violated rule 32:8.4(c). Under Iowa Code section 715A.6(1)(*a*)(3), "[a] person commits a public offense by using a credit card for the purpose of obtaining property or services with knowledge of any of the following: . . . [f]or any other reason the use of the credit card is unauthorized." Iowa Code § 715A.6(1)(*a*)(3) (2015). The unauthorized use of a credit card when the value "sought to be secured by means of the credit card is greater than one thousand but not more than ten thousand dollars" is a class "D" felony. *Id.* § 715A.6(2)(*b*).

The evidence presented in the stipulation is sufficient to show, by a convincing preponderance of the evidence, Suarez-Quilty committed unauthorized use of a credit card to obtain property or services valued at $5000. Suarez-Quilty admitted to knowingly using a Square Magstripe Reader that was plugged into her iOs or Android device to swipe Eckert's credit card. The record shows Suarez-Quilty made this charge of $5000 to Eckert's Chase Freedom Visa credit card on July 10, 2015. Five days prior to committing this unauthorized use, Rawson emailed Suarez-Quilty to let her know that he was disputing the legal fees she claimed he still owed. Rawson requested that Suarez-Quilty "cease all further communication with [him] in regards to collections of [his] account," and informed her that he would "opt for arbitration of the billing for [his] account if [she] continue[d] to harass [him] either by email, text, or phone call." Thus, it was clear that Suarez-Quilty did not have authorization to charge Eckert's credit card for $5000 for the work Suarez-Quilty performed in the Rawson matter since she was aware the fees were being disputed.

Suarez-Quilty also clearly acknowledged her unauthorized use of the credit card in her stipulation, admitting she violated rule 32:8.4(c) by committing the acts alleged in Count VII (unauthorized use of credit card) of the Board's complaint. Consequently, we find by a convincing preponderance of the evidence that Suarez-Quilty "acted knowingly, intentionally, or with the aim to mislead" when she engaged in the unauthorized use of Eckert's credit card in violation of rule 32:8.4(c). *Guthrie*, 901 N.W.2d at 498.

In the Keny matter, the commission noted in its finding that Suarez-Quilty had "no reasonable explanation for not returning the $630 given to her to cover the cost of the appeal," nor did she have a colorable future claim to the $630. The commission also relied on Suarez-Quilty's stipulation that she "exhausted Mr. Keny's retainer and kept the $630 to which she had no claim" in its finding. This conversion amounts to a violation of Iowa Code sections 714.1(2) (governing misappropriation of property held in trust for personal use), and 714.2(3) (theft of property greater than $500 but less than $1000 is theft in the third degree). The Board has presented sufficient evidence to demonstrate Suarez-Quilty converted Keny's funds for her personal use. Suarez-Quilty admitted to knowingly keeping these funds without any future colorable claim to them, and the record supports this stipulation. Thus, we also find Suarez-Quilty knowingly misappropriated and converted client funds in the Keny matter in violation of rule 32:8.4(c).

**B. Sanctions.** Our range of applicable sanctions for a violation of rule 32:8.4(c) spans "from a public reprimand all the way to license revocation" depending upon the presence of the attorney's colorable future claim to the funds. *Guthrie*, 901 N.W.2d at 499. The burden is on the attorney to prove that he or she had a colorable future claim to the funds

at issue. *Id.* When the attorney cannot prove a colorable future claim to the funds, it is considered theft of client funds, which is grounds for revocation. *Id.* at 500. In fact, we have revoked the attorney's law license "in nearly every case where an attorney converts client funds without a colorable future claim." *Id.*[3] There is no grey area with regard to the appropriate sanction for an attorney who converts client funds without a colorable future claim, as "[t]here is no place in our profession for attorneys who convert funds entrusted to them." *Thomas*, 844 N.W.2d at 117 (alteration in original) (quoting *Comm. on Prof'l Ethics & Conduct v. Otteson*, 525 N.W.2d 865, 866 (Iowa 1994)).

While it may be debatable whether Suarez-Quilty had a colorable future claim to the funds in the Rawson matter, it is clear that she did not have a colorable future claim to the funds she converted in the Keny matter. This leads us to the conclusion that she misappropriated client funds. In the stipulated facts, Suarez-Quilty admits that she did not have a colorable future claim to the funds and converted them for her personal use in the Keny matter. She also failed to present any evidence to the contrary. "This finding is critical to the outcome of this proceeding and

---

[3]*See, e.g.*, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe*, 830 N.W.2d 737, 742 (Iowa 2013) (quoting numerous cases wherein we held revocation was the appropriate sanction when attorneys converted client funds); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen*, 807 N.W.2d 259, 266 (Iowa 2011) ("It is almost axiomatic that we will revoke the license of an attorney who converts a client's funds to his or her own use."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Williams*, 675 N.W.2d 530, 533 (Iowa 2004) (revoking attorney's license for fictitious billing); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 145–46 (Iowa 2004) (revoking attorney's license for stealing client funds); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 655 (Iowa 2002) (revoking attorney's license for misappropriating funds); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon*, 602 N.W.2d 336, 339 (Iowa 1999) (revoking the license of an attorney who misappropriated client funds); *Comm. on Prof'l Ethics & Conduct v. Ottesen*, 525 N.W.2d 865, 866 (Iowa 1994) (revoking attorney's license for converting client funds to his own use); *Comm. on Prof'l Ethics & Conduct v. Tullar*, 466 N.W.2d 912, 913–14 (Iowa 1991) (stating revocation is appropriate when attorneys convert client funds).

makes it unnecessary for us to discuss the other rule violations in detail." *Guthrie*, 901 N.W.2d at 500. Because of this finding, "we need not consider mitigating and aggravating factors that may be present here." *Id.* We agree with the Board that revocation is the appropriate sanction in this case.

### IV. Conclusion.

The license of Sandra E. Suarez-Quilty to practice law in the State of Iowa is hereby revoked. Pursuant to our rules, Suarez-Quilty may apply for reinstatement after a period of at least five years. *See* Iowa Ct. R. 34.25(7). Should Suarez-Quilty apply for reinstatement, she must provide "satisfactory proof that [she] is of good moral character and is in all respects worthy of readmission to the bar." *Id.* r. 34.25(9)(*c*). Suarez-Quilty must also pay all fees. *See id.* r. 34.25(9)(*d*).

**LICENSE REVOKED.**